IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| Michael Leon Tyner | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19 CV 01502 |
| | ) | Judge John Robert Blakey |
| Bonnie Nowakowski, | ) | |
| Brij Mohan, R.A. Heisner | ) | JURY TRIAL DEMANDED |
| Richard Walenda, Rachel Nelson, | ) | |
| And unknown correctional officers, | ) | |
| And unknown medical personnel, | ) | |
| | ) | |
| Defendants. | ) | |

FIRST AMENDED COMPLAINT

Now comes the Plaintiff, Michael Leon Tyner, by and through his Court-appointed attorney, Michael J. Cummins, and complaining of the Defendants, Bonnie Nowakowski, Brij Mohan, Richard Wallenda, Rachel Nelson, R.A. Heisner, and unknown correctional officers and unknown medical personnel states as follows:

INTRODUCTION

1. This action is brought pursuant to 42 U.S.C. Section 1983 to redress the deprivation by the Defendants, at all times relevant, employees of the U.S. Bureau of Prisons and U.S. Marshal Service, of Plaintiff's rights as secured by the United States Constitution.

JURISDICTION AND VENUE

2. This Court has jurisdiction of the action pursuant to 28 U.S.C. Section 1331.

3. Venue is proper under 28 U.S.C. Section 1391(b). On information and belief, all parties reside in this judicial district, and the events giving rise to the claims asserted herein all

1

occurred within this district.

## THE PARTIES

4. Mr. Tyner is currently in pre-trial detention in the custody of the U.S. Marshall on home confinement in Decatur, Illinois. At all times relevant herein he was, and is, a citizen of the State of Illinois. He was born on November 2, 1987, and is 31 years of age.

5. Mr. Tyner is an honors graduate of Kennedy-King College in 2015. He has been married to Tatiana Crowe since January 29, 2018. He and Tatiana live together with their 12 month old daughter, Michelle.

6. From and after the time prior to his confinement, as stated herein, Mr. Tyner suffered, and continues to suffer, from obviously serious medical conditions, namely: Human Immunodeficiency Virus (HIV), an active Syphilis infection, and Herpes. Mr. Tyner did not become aware of his active Syphilis infection until after he was incarcerated.

7. At all times relevant herein, Mr. Tyner has been in the custody of the U.S. Marshall's office. First at the Jerome Combs Detention Center (JCDC), then at the Metropolitan Correction Center (MCC), then at the Livingston County Jail (LCJ), and then in custodial home detention.

8. Mr. Tyner initially entered custody at the JCDC. On August 28 2018, his custody was transferred from the JCDC to the MCC.

9. On August 28, 2018, Mr. Tyner was transferred to custody at the MCC where he remained until April 18, 2019, when he was transferred to the Livingston County Jail. On May 1, 2019, Mr. Tyner was placed on custodial home confinement in Decatur, Illinois, where he lives with his wife and their young daughter.

10. At all times relevant herein, the Defendant Rachel Nelson was a registered nurse at the JCDC where she acted with reference to Mr. Tyner under the direction of the U.S. Marshall's Office and the Bureau of Prisons. As such, the Defendant was acting under color of law. Defendant Nurse Nelson was responsible for, among other things, communicating Mr. Tyner's requests for medication and/or medical attention to medical care providers, who are responsible for the medical care of inmates at the JCDC, alerting medical care providers to inmates' medical needs while detained at the JCDC, and with fully preparing medical information and conditions about inmates, such as Mr. Tyner, should they be transferred to custody at another detention center such as the MCC.

11. At all times relevant to the events at issue in this case, Defendants Nowakowski and Mohan were respectively the staff physician and clinical director employed by the MCC and both worked at the MCC. As such, these Defendants were acting under color of law. Defendants Nowakowski and Mohan were responsible for, among other things, communicating Mr. Tyner's requests for medication and/or medical attention to medical care providers, who are responsible for the medical care of inmates at the MCC, and otherwise alerting medical care providers to Mr. Tyner's medical needs while he was detained at the MCC.

12. At all times relevant to the events in this case, Defendant Walenda was an employee of the U.S. Marshall's office, where he had direct contact with Mr. Tyner. Mr. Tyner, on a number of occasions while he was in custody, communicated to Walenda of his serious medical conditions. Mr. Tyner pleaded with Defendant Wallenda for treatment and for access to Mr. Tyner's medication. Defendant Wallenda ignored Mr. Tyner's pleas for help and medication. On at least one occasion, Defendant locked Mr. Tyner in a cage and told other prisoners about Mr. Tyner's illnesses.

13. At all times relevant herein, Defendant R.A. Heisner was employed in the capacity of

3

Warden of the MCC. As such, at all times relevant to the events at issue in this case, Defendant Heisner promulgated rules, regulations, policies, and procedures as Warden of the MCC for the provision of certain medical care, including medical screening of and administration of medical care and medications to inmates at the MCC by medical care providers such as physicians and medical technicians, employed by the MCC at the MCC. Defendant Heisner's policies were implemented by and through MCC employees including the individual MCC medical care providers, who were responsible for the medical care of inmates at the MCC, including Mr. Tyner.

14. At all times relevant to the events at issue in this case, Defendant Heisner promulgated rules, regulation, policies, and procedures as Warden for the training, supervision, and discipline of correctional officers with respect to: (1) communicating or failing to communicate inmate requests for medication, medical attention, and/or medical treatment to medical care providers, who are responsible for the medical care of inmates at the MCC; and (2) alerting or failing to alert medical care providers to the inmate's medical needs. Defendant Heisner's policies were implemented by and through MCC employees including the individual MCC employees including the individual MCC Defendants correctional officers and correctional medical technicians, who were responsible for ensuring that the medical needs of inmates at the MCC, including Mr. Tyner, were made known to the responsible medical care providers employed by the MCC.

FACTUAL ALLEGATIONS

15. Mr. Tyner's initial confinement was at the JCDC in the custody of the U.S. Marshal. He

4

went into the JCDC suffering from HIV, Herpes, post-colorectal cancer symptoms, and, unknown to him, and active Syphilis infection. At the JCDC, he constantly requested treatment for these obviously serious medical conditions. His requests addressed to Defendant Nelson, Dr. Nowakowski, Clinical Director Mohan, and Warden Heisner were ignored and repelled. Tired of Mr. Tyner's complaints and requests of MCC personnel, Mr. Tyner was transferred to the LCJ on April 18, 2019, in the custody of the U.S. Marshal.

16. While in custody at the JCDC, on March 12, 2018, Mr. Tyner's wife Tatania delivered a letter to Judge Leinenweber pleading the Court to order medical treatment for Mr. Tyner. Judge Leinenweber agreed that Mr. Tyner should see an infectious disease specialist.

17. On or about March 13, 2018, Mr. Tyner was being held in a bull-pen at the Dirksen Federal Building prior to his transfer back to the JCDC. He was confronted by U.S. Marshal Defendant Wallenda who told him to "tell your idiot wife to stop sending letters about HIV meds." Mr. Tyner had spit on the floor to show Richard Wallenda that he was bleeding and coughing up blood. Richard Wallenda said that the JCDC had sent a request to the wrong pharmacy. Wallenda also told the Mr. Tyner that the HIV medication cost several thousand dollars and that he could not afford the medication if he was not locked up. Richard Wallenda discussed Mr. Tyner's medical condition in front of other inmates. Richard Wallenda then placed Mr. Tyner in a separate cage apart from other inmates.

18. While Mr. Tyner was being transferred back to the JCDC, several inmates said that Richard Wallenda told them that Mr. Tyner had an infectious disease.

19. While an inmate at the JCDC, Mr. Tyner repeatedly requested of Defendant Nelson that he be seen by an infectious disease specialist. His requests were directed to Registered Nurse Rachel Nelson who was acting for and on behalf of Mr. Tyner's custodian, the U.S. Marshal.

20. While at the JCDC, Mr. Tyner began having aggressive thoughts and often felt compelled to kill himself. Further, Mr. Tyner suffered sexual abuse at the JCDC inflicted by another inmate. His reports of the sexual abuse made to Defendant Nelson and others at the JCDC were ignored.

21. After Mr. Tyner's repeated requests that were ignored by the Defendant Nelson, she finally sent Mr. Tyner to Martin Phillips, M.D., an infectious disease physician. Mr. Tyner was not seen by Dr. Phillips until June 11, 2018. He was seen again by the doctor on June 26th. Dr. Phillips reported back to Defendant Nurse Nelson that further testing of Mr. Tyner was needed for Mr. Tyner's active Syphilis infection. Dr. Phillips recognized that Mr. Tyner was suffering from HIV. In addition, Dr. Phillips directed that Mr. Tyner should see a gastrointestinal specialist to conduct examinations relative to the bloody stools that Mr. Tyner was experiencing, especially in view of the fact that he had a family history of colorectal cancer.

22. Defendant Nelson received Dr. Phillips' reports. Despite continued appeals by Mr. Tyner, Defendant Nelson ignored the directions of Dr. Phillips. She did nothing to provide Mr. Tyner with any of the follow-up medical tests and treatment in conformance with Dr. Phillips directives.

23. With no testing or treatment forthcoming at the JCDC, Mr. Tyner told his attorney that he wanted to change his plea to the charges pending before Judge Leinenweber to "Guilty" in the hope that he would then be transferred to the MCC where he hoped that he would have a better chance at receiving medical testing as to the progression of his serious medical conditions, as aforementioned, and treatment for those conditions.

24. On August 28, 2018, Mr. Tyner was transferred from the JCDC to the MCC. Defendant Nelson was to see to it that Mr. Tyner's medical conditions and Dr. Phillips' directives were forwarded to the MCC.

25. Mr. Tyner's transfer documents from JCDC to the MCC were prepared and signed by Defendant Nurse Rachel Nelson of the U.S. Marshal's Service. Nurse Rachel Nelson made no mention in the transfer documents that Mr. Tyner was suffering from an active Syphilis infection.

26. Fourteen days after arriving at the MCC, on or about September 10, 2018, Mr.Tyner asked Deendant Nowakowski why he was not being treated for his active Syphilis infection. Defendant Nowakowski told Mr. Tyner that a positive active Syphilis infection report was not stated in his transfer file.

27. On or about September 10, 2018, Defendant Nowakowski told Mr. Tyner that an infectious disease specialist would have to deal with him because he had "too many issues."

28. Mr. Tyner told Defendant Nowakowski that he had seen a specialist at JCDC and that he was in need of treatment for his active Syphilis infection. Mr. Tyner provided Defendant Nowakowski with medical records from JCDC and pleaded with Nowakowski to contact Dr. Martin Phillips who had ordered treatment for him at JCDC.

29. Defendant Nowakowski refused to obtain from the JCDC further medical records and refused to provide testing or treatment for Mr. Tyner's active Syphilis infection.

30. On or about September 17, 2018, Mr. Tyner spoke with a psychiatrist for a routine MCC examination. He told the doctor that the MCC was not following up with his Syphilis treatment.

31. The MCC Psychiatrist asked Defendant Nowakowski about the treatment of Mr. Tyner's active Syphilis infection, Nowakowski told the psychiatrist that she had put in a request for Mr. Tyner to see someone and that she would let a specialist handle matters.

32. Mr. Tyner then sent direct messages to the medical director Ndife, Nowakowski, and Dr. Brij Mohan seeking treatment. All of his emails went unanswered.

33. Mr. Tyner signed up for sick-call, but none of his concerns about his active Syphilis infection were taken up at the sick-calls. He informed an MCC staff nurse that he was having a Herpes outbreak and also needed treatment for Syphilis. The staff nurse provided Herpes medication but provided no Syphilis treatment.

34. On or about October 15, 2018, Mr. Tyner was given blood tests at the MCC and the MCC medical staff received the test results on or about October 18, 2018.

35. Defendant Nowakowski and Clinical Director Dr. Brij Mohan refused to provide Mr. Tyner with any treatment and did not discuss his test results until after Mr. Tyner saw Dr. Sein Yeo, an infectious disease specialist, on or about October 30, 2018. Dr. Yeo ordered treatment for Mr. Tyner which did not begin until on or about November 1, 2018. Mr. Tyner then received weekly, painful injections which caused bleeding through his clothes. Mr. Tyner was denied new, clean clothing. His concerns were with the effectiveness of the injections because the medication was leaking out with his blood. He made his concerns known to Nurse Hart and other medical staff and asked for follow-up testing. After retesting for Syphilis, Defendant Mohan told him that the infection had dissipated and was no longer active. In January of 2019, Mr. Tyner saw Dr. Sein Yeo at Thorek Hospital in Chicago. Dr. Yeo recorded "a spike in his HIV viral load, an active Herpes outbreak, and little progress in treatment of his active Syphilis infection." Dr. Yeo advised the MCC that Mr. Tyner should be admitted to the hospital for emergency treatment.

36. Defendant Nowakowski and Clinical Director Dr. Mohan refused to have Mr. Tyner admitted to the hospital until February 8, 2019, where he remained until February 17, 2019.

37. February 17, 2019, was a Sunday. Mr. Tyner had not been provided with the emergency medication prescribed by Dr. Yeo. When he requested the emergency medication, he was told by MCC Nurse Hart that the MCC pharmacy was closed on that Sunday and was also closed on the next day, Monday, so he would receive no medication until then.

38. On the evening of February 17, 2019, Mr. Tyner told MCC Nurse Grullon that he had backup medication in his property. Nurse Grullon and another MCC staff member told him that the medication could not be retrieved from his property because the property officer would not be back until Tuesday. As a result of these missed dosages of medicine, and a prolonged exposure to Syphilis, Mr. Tyner's body grew resistant to the one-a-day HIV medication. As a result, he is now limited in what drugs can effectively treat his HIV.

39. Since prior to his initial custody at the MCC, Mr. Tyner suffered from severe depression. As an inmate at the JCDC and MCC, receiving no treatment for his above-noted obviously serious medical conditions, Mr. Tyner's depression deepened. He was unable to sleep, he began to act out aggressively, and had strong desires to hurt himself and end his life. Mr. Tyner feared dying from HIV related illness due to the fact that he was not being treated for Syphilis. His wife was pregnant and he had been given no information for her regarding the infection to know if his wife and unborn child needed monitoring or treatment. Even after the positive results of the Syphilis test, Mr. Tyner's pregnant wife was not notified.

40. Both at the JCDC and the MCC, at the times of the events and non-action alleged herein, Mr. Tyner exhausted his administrative remedies through the guideline processes prescribed by the rules and regulations promulgated by the Wardens and authorities of the JCDC and the MCC, all to no avail to him.

41. Defendant Heisner's response to Mr. Tyner's formal complaint was not on Bureau of Prison letterhead, which was a procedural requirement in order for Mr. Tyner to send complaints to regional administrators. After Defendant Heisner responded to the administrative complaint, Mr. Tyner asked the person who delivered Heisner's response why it was untimely and without a letterhead. The person delivering the response told Mr. Tyner that if he did not like it he should file another grievance. As a result of the deliberate omitting of a letterhead, the letter was rejected by the regional administrator. Mr. Tyner re-sent the letter to the regional administrator and it was again rejected because of the lack of a letterhead on Defendant Heisner's response.

42. Though, pleaded for repeatedly by Mr. Tyner from the Defendants, he was denied care, treatment, and medication for his obviously serious medical conditions by the Defendants. As a direct and proximate result of the intentional and negligent disregard of Mr. Tyner's medical conditions, he has suffered physical pain, deep depression, strong urges to aggressive behavior, and a strong desire to end his life.

LEGAL CLAIMS

43. Defendants, including Nowakowski, Mohan, Heisner, Walenda, Nelson, and Unknown Medical Personnel did not give Mr. Tyner his necessary medication or provide medical attention even though they knew that a substantial risk of serious harm existed if he did not receive the necessary medication or medical attention to treat his serious medical need.

44. Additionally, Defendants (see above) and Unknown Correctional Officers failed to alert any medical care provider (including any medical technician, nurse or doctor) of Mr. Tyner's need for medication and/or medical attention, even though they knew that a substantial risk of serious harm existed if he did not receive the necessary medication and/or medical

attention to treat his serious medical need.

## DAMAGES

45. As a result of Defendants' misconduct, Mr. Tyner's medical condition continued to worsen, causing him severe pain and suffering.

46. Also, as a result of the misconduct of Defendants', Mr. Tyner has suffered severe physical disability and physical and emotional injuries. He has suffered extensive and permanent damage.

## LEGAL CLAIMS

47. In the manner described more fully herein, Defendants (see above) and Unknown Medical Personnel and Unknown Correctional Officers caused Mr. Tyner's damages by violating his constitutional rights and/or failing to intervene to prevent the same. Among others, Defendants violated Mr. Tyner's rights under the Fourth, Eighth, and Fourteenth Amendments.

48. As described more fully herein, while Mr. Tyner was incarcerated at the MCC and JCDC, Defendants (see above) and Unknown Medical Personnel and Unknown Correctional Officers failed to provide him with adequate medical attention. In this manner, the conduct of Defendants was objectively unreasonable and deliberately indifferent to Mr. Tyner's objectively serious medical need.

49. As described more fully herein, Defendants (see above), Unknown Medical Personnel and Unknown Correctional Officers engaged in extreme and outrageous conduct with respect to Mr. Tyner, to wit, they refused to provide him with adequate medical attention despite his objectively serious need. This misconduct was rooted in an abuse of power or authority, and it was undertaken with intent or knowledge that there was a high probability that the

conduct would inflict a worsening of his medical condition, severe emotional distress and with reckless disregard of that probability.

50. At all times relevant herein, Defendant Heisner, as Warden of the MCC, maintained a policy or procedure under which inmates with serious medical conditions, such as Mr. Tyner, were routinely denied access to proper or sufficient medication and medical care.

51. Defendant Heisner's policies and procedures were manifest in the frequent failure and refusal by people under his direction and control to provide proper or adequate medication and medical care to inmates whom they knew to have serious medical conditions, and to ignore requests by inmates for medical care and medication for which they had a serious medical need of which the employee knew.

52. Defendant Heisner's policies and procedures resulted in the frequent failure to provide inmates such as Mr. Tyner with essential prescription medications, despite the fact that prescriptioin orders had been written for such medications.

53. At all times relevant herein, Defendant Heisner knowingly maintained a policy or procedure at the MCC in which he and his subordinates were responsible for providing medical care to inmates, in which its employees commonly failed or refused to: (1) properly examine an inmate with a serious medical condition; (2) provide prescription medication to an inmate with a serious medical condition; and in which its employees routinely ignored and refused to respond to inmates who; (3) requested medical care or medication or asked to see a doctor; or (4) exhibited obvious signs of a serious medical condition or illness.

54. Defendant Heisner, as Warden, had a constitutional obligation to maintain and provide continuing adequate and appropriate medical evaluation and medical care and treatment of prisoners incarcerated at the MCC.

55. As a direct and proximate result of the unconstitutional policies and procedures of

Defendants (see above), as set forth herein, Mr. Tyner was deprived of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

56. At all times relevant to the events at issue in this case, it was the duty of Defendant Heisner through his agents and employees acting within the scope of their employment, including the individual Defendants named herein, to refrain from engaging in willful and wanton misconduct by failing or refusing to provide adequate and appropriate medical care to inmates with serious medical conditions.

57. At all times relevant herein, Defendant Heisner, as Warden of the MCC, was responsible for the creation, implementation, oversight, and supervision of all policies and procedures followed by Bureau of Prisons and the U.S. Marshal employees at the MCC, including medical technicians and correctional officers.

58. At all times relevant herein, Defendant Heisner had notice of a widespread practice by employees at the MCC under which inmates with serious medical conditions, such as Mr. Tyner, were routinely denied access to proper or sufficient medication and medical care. Specifically, there existed a widespread practice at the MCC under which employees, including medical technicians and correctional officers, commonly failed or refused to : (1) properly examine an inmate with a serious medical condition; (2) provide prescription medication to an inmate with a serious medical condition; and routinely ignored and refused to respond to inmates who: (3) requested medical care or medication or asked to see a doctor; or (4) exhibited obvious signs of a serious medical condition or illness.

59. The above-described widespread practice, so well-settled as to constitute a de facto policy of Defendant Heisner, as Warden, who had authority over the same, exhibited deliberate indifference to the problem. Specifically, Defendant Heisner had notice of this widespread practice of failure to attend to inmates' serious medical needs through lawsuits filed against

him and other MCC employees, as well as grievances and other complaints filed by inmates and submitted to him. Defendant Heisner mainifested deliberate indifference to these constitutional violations by failing to take reasonable measures to remedy these violations. Among other things, Defendant Heisner failed to adequately train, supervise, control, and discipline MCC employees who: (1) failed to provide proper or adequate medication or medical care to inmates whom they knew to have serious medical conditions; (2) ignored requests by inmates for medical care whom they observed to exhibit signs and symptoms of serious medical conditions for which they were aware serious medical care was required; and (3) otherwise failed to alert medical care providers to the medical needs of inmates whom they knew to have serious medical conditions.

60. Mr. Tyner's injuries were proximately caused by the policies and widespread practices of Defendant Heisner as described above. These widespread practices were allowed to flourish because Defendant Heisner directly encouraged and was thereby the moving force behind, the very type of misconduct at issue by failing to adequately train, supervise, control, and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Mr. Tyner. In this way, Defendant Heisner directed, knew about, facilitated, approved, condoned, and consented to the conduct that caused the violation of Mr. Tyner's constitutional rights, and violated Mr. Tyner's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

61. As a direct and proximate result of the unconstitutional policies and widespread practices maintained by Defendant Heisner, as set forth herein, Mr. Tyner was deprived of his rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

62. Defendant Heisner had a constitutional obligation to provide continuing adequate and appropriate supervision, training, and discipline for MCC employees with respect to medical

14

evaluation, screening, care and treatment of, and provision of medication to inmates incarcerated at the MCC.

63. At all times relevant to the events at issue in this case, it was the duty of Defendant Heisner, through his maintenance of policies, procedures, rules and regulations for the conduct and discipline of MCC employees at the MCC, including the individual Defendants named herein, to refrain form engaging in willful and wanton misconduct by failing or refusing to remedy the widespread practices of failure to provide necessary medical care to inmates with serious medical conditions.

64. The misconduct described herein was objectively unreasonable, and undertaken with malice, willfulness, and deliberate or reckless indifference to the rights of others such that the Defendants' actions shock the conscience.

65. As a proximate result of the Defendants' misconduct described in this Complaint, Mr. Tyner suffered damages, including but not limited to permanent physical disability and mental distress and anguish.

66. All of Defendants' interactions with Mr. Tyner were undertaken under color of law, and within the scope of their employment.

67. The acts and omissions of the Defendants as set forth herein, and actions engaged in by Defendants predicated on the policies and procedures described herein, individually and collectively, caused Mr. Tyner to endure great pain and suffering which caused him severe emotional distress.

68. The Defendants and each, at all times relevant herein, all acted as alleged within the scope of their employment.

69. At all times mentioned herein, Mr. Tyner filed grievances for the actions and inactions of the Defendants pursuant to the administrative guidelines for grievances. Mr. Tyner has exhausted his administrative remedies. All of Mr. Tyner's grievances were rejected or denied.

15

WHEREFORE, the Plaintiff, Michael Leon Tyner, respectfully requests that this Court enter Judgment in his favor and against Defendants Dr. Bonnie Nowakowski, Brij Mohan, R.A. Heisner, Richard Wallenda, Rachel Nelson, and unknown correctional officers and unknown medical personnel, awarding compensatory damages, punitive damages, and attorney's fees.

Respectfully submitted,

Michael Leon Tyner

By:/s/Michael J. Cummins
    Michael J. Cummins,
    Attorney for Plaintiff

JURY DEMAND

Plaintiff, Michael Tyner, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all triable issues.

Respectfully submitted,

Michael Leon Tyner

By:/s/Michael J. Cummins
    Michael J. Cummins,
    Attorney for Plaintiff

Prepared by:
Michael J. Cummins
20 East Westleigh Road
Lake Forest, Illinois 60045
Phone: 847/295-0138
Fax: 847/295-0179
ARDC: 0557609
Michael@cumminslitigation.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/EFC system, which then sends notification of the filing to all counsel of record.

By:/s/Michael J. Cummins_____
Michael J. Cummins